87 F.Supp.2d 912 (2000)
MISSOURI REPUBLICAN PARTY, et al., Plaintiffs,
v.
Charles G. LAMB, et al., Defendants.
No. 4:98CV1909 CDP.
United States District Court, E.D. Missouri, Eastern Division.
March 13, 2000.
Douglas Bruce La Pierre, Washington University, St. Louis, MO, Patric A. Lester, Lester and Associaltes, St. Louis, MO, W. Bevis Schock, Clayton, MO, for Plaintiffs.
James R. Layton, Paul Maguffee, Atty. Gen. of Missouri, Asst. Atty. Gen., Jefferson City, MO, for Defendants.

MEMORANDUM AND ORDER
PERRY, District Judge.
This matter is before the Court on defendants' motion to vacate the preliminary injunction issued on January 13, 1999. In that order, the Court enjoined enforcement of Missouri's laws limiting campaign contributions made by political party committees to their candidates. Missouri Republican Party v. Lamb, 31 F.Supp.2d 1161 (E.D.Mo.1999). Pursuant to an agreement reached by the parties, the Court thereafter stayed all further proceedings in this action pending the United States Supreme Court's decision in Nixon v. Shrink Missouri Gov't PAC, cert. granted, 525 U.S. 1121, 119 S.Ct. 901, 142 L.Ed.2d 901 (1999).
On January 24, 2000, the Supreme Court decided Nixon, and upheld Missouri's limits on campaign contributions made by individuals and entities other than political parties. See Nixon v. Shrink Missouri *913 Gov't PAC, ___ U.S. ___, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Based on that opinion, defendants moved the Court on the same date to vacate the injunction. Plaintiffs oppose the motion to vacate, and the issues have been fully briefed. Because this case raises substantial and unsettled issues concerning regulation of the speech and associational rights of Missouri's political parties, the Court will continue the preliminary injunction. The Court will also set the matter for expedited briefing and a hearing on the merits.[1]

I. Background

The relevant background facts remain unchanged since the Court issued its preliminary injunction on January 13, 1999. Plaintiff Missouri Republican Party is a political party committee as defined by Missouri Revised Statute § 130.011(25). Plaintiff Charles A. Pierce was the Republican candidate for Missouri state auditor in the 1998 general election; plaintiff Pierce for Auditor is a Missouri candidate committee, as defined by Missouri Revised Statute § 130.011(9); and plaintiff Marc Ellinger is treasurer of that committee. Plaintiff Eric Zahnd was the Republican candidate for the Missouri State Senate for the 34th District in the 1998 general election; plaintiff Citizens for Eric Zahnd is a Missouri candidate committee, and plaintiff Lee R. Keith is treasurer of that committee. Plaintiff Michael J. Reid was the Republican candidate for Missouri State Senate for the 78th District in the 1998 general election; plaintiff Citizens for Mike Reid is a Missouri candidate committee; and plaintiff Elaine Tschee Reid is treasurer of that committee.
Defendant Charles G. Lamb is executive director of the Missouri Ethics Commission ("Ethics Commission"); defendants Robert Gardner and Patricia Flood are chair and vice-chair, respectively, of that commission; and defendants Richard Adams, Elaine Spielbusch, Donald Gann, and Mike Greenwell are members of that commission. Defendant Jeremiah W. Nixon is the Missouri attorney general.
Missouri Revised Statute § 130.032.4 limits the amount of cash and in-kind contributions that a political party committee can make and accept in any one election. The subsection reads, in relevant part, as follows:
Except as limited by this subsection, the amount of cash contributions, and a separate amount for the amount of in-kind contributions, made by or accepted from a political party committee in any one election shall not exceed the following:
(1) To elect an individual to the office of governor, lieutenant governor, secretary of state, state treasurer, state auditor, or attorney general, ten thousand dollars;
(2) To elect an individual to the office of state senator, five thousand dollars;
(3) To elect an individual to the office of state representative, two thousand five hundred dollars; and
(4) To elect an individual to any other office of an electoral district, ward or unit, ten times the allowable contribution limit for the office sought.
Missouri Revised Statute § 130.032.2 requires that the limits contained in § 130.032.4 be adjusted for inflation in each even-numbered year by a calculation employing the cumulative consumer price index. In early 1998, the Ethics Commission increased the limits listed in § 130.032.4(1)-(3) to $10,750, $5,250, and $2,750, respectively.
A committee that accepts or gives contributions in excess of the statutory limits is subject to a significant penalty, unless it promptly returns the contribution to the contributor after being so instructed by *914 the Ethics Commission. See Mo.Rev.Stat. § 130.032.7. The per-contribution penalty is one thousand dollars plus an amount equal to the contribution. Id. The candidate and the candidate committee treasurer (or deputy treasurer) are personally liable for payment of that penalty. Id. Alternatively, they may pay the penalty from campaign funds existing on the date that the committee was notified of the violation by the Ethics Commission. Id.

II. Discussion

In deciding whether to vacate a preliminary injunction, the Court must apply the same standards it used when issuing the injunction in the first instance. See Baker Elec. Co-op., Inc. v. Chaske, 28 F.3d 1466, 1472 (8th Cir.1994) (district court should apply Dataphase factors when deciding whether to rescind preliminary injunction). These standards are well-settled and require the Court to consider: (1) the likelihood that the movant will succeed on the merits of its claim, (2) the threat of irreparable harm to the movant, (3) the balance between that harm and the injury that granting the injunction may inflict on other interested parties, and (4) whether the issuance of an injunction is in the public interest. United Indus. Corp. v. Clorox Co., 140 F.3d 1175, 1178-79 (8th Cir.1998); Dataphase Sys., Inc. v. CL Sys., Inc., 640 F.2d 109, 114 (8th Cir.1981) (en banc). The court must examine each factor in determining "whether the balance of equities weighs toward granting the injunction." United Indus. Co., 140 F.3d at 1179. Thus the question the Court must consider is whether, in light of Nixon, it would enjoin enforcement of Missouri's campaign contribution laws as applied to political party committees. As discussed below, the answer is "yes."

A. Likelihood of Success on the Merits

Defendants contend that plaintiffs' likelihood of success on the merits of their claim is doubtful given the Supreme Court's rejection in Nixon of the analysis previously employed by the Eighth Circuit Court of Appeals in Russell v. Burris, 146 F.3d 563 (8th Cir.1998), and Shrink Missouri Government PAC v. Adams, 161 F.3d 519 (8th Cir.1998) (Shrink II), rev'd sub nom., Nixon, ___ U.S. ___, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000). Because the undersigned relied on the Eighth Circuit's approach in Russell and Shrink II to enjoin enforcement of the contribution limits at issue here, defendants contend that the plaintiffs' position (and the Court's order granting the preliminary injunction) are now devoid of legal support.
Defendants further assert that Missouri's limits on contributions by political parties withstand the level of scrutiny applied by the Nixon Court when discussing the regulation of first amendment rights in the context of Missouri's contribution limits on individuals. They contend that imposing limits on contributions by political parties: 1) prevents evasion of Missouri's contribution limits on individuals, which have been upheld in Nixon ("anti-evasion rationale"); and 2) promotes the state's interest in preventing corruption and the appearance of corruption in the electorate process ("anti-corruption rationale"), an interest expressly sanctioned by the Court in Nixon.
Not surprisingly, plaintiffs argue that defendants paint the import of Nixon with too broad a brush. For their part, plaintiffs claim that the Supreme Court's holding in Nixon did not address the validity of campaign contribution limits on political party committees. They maintain that a political party's contributions to its candidates are entitled to protection under the first amendment as interpreted by (other) Supreme Court precedent. Moreover, plaintiffs attack the state's rationale for the contribution limits at issue by claiming that: 1) the state's espoused anti-corruption interest has no force in the context of contributions by political parties; and 2) the contribution caps on political parties do not promote the state's anti-evasion rationale because they do not prevent evasion of the individual contribution limits.
*915 When the motion for preliminary injunction first came before this Court in January of 1999, there were no valid limits under Missouri law on the amount of money that an individual could contribute to a candidate for state office. See Shrink II, 161 F.3d at 522. The Court therefore issued the injunction in large part because "one of the purported objectives of the contribution limits at issue here (i.e., thwarting a person from evading the limit on the amount that he or she can legitimately give to a given candidate) has ceased to have any force whatsoever." Lamb, 31 F.Supp.2d at 1164. Obviously, this statement is no longer true in light of Nixon.[2] However, this fact does not compel the Court to vacate the preliminary injunction.
While the probability that the movant will succeed on the merits is generally regarded as the most important factor of the Dataphase test, "[t]he very nature of the inquiry on petition for preliminary relief militates against a wooden application of the probability test." Dataphase, 640 F.2d at 113. As the Eighth Circuit observed:
The likelihood that plaintiff ultimately will prevail is meaningless in isolation. In every case, it must be examined in the context of the relative injuries to the parties and the public. If the chance of irreparable injury to the movant should relief be denied is outweighed by the likely injury to other parties litigant should the injunction be granted, the moving party faces a heavy burden of demonstrating that he is likely to prevail on the merits. Conversely, where the movant has raised a substantial question and the equities are otherwise strongly in his favor, the showing on the merits can be less.
Id. It is against this backdrop that the Court must evaluate the likelihood of plaintiffs' success on the merits.
There are few legal issues more complex than those posed by this case. The Supreme Court's jurisprudence in the area of campaign finance reform is equivocal at best. In some respects the Court's opinion in Nixon may have raised more questions than it answered. In upholding Missouri's individual contribution limits, the Supreme Court adopted the analytical framework first set out in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), and held that state contribution limits "could survive if the [g]overnment demonstrated that contribution regulation was closely drawn to match a sufficiently important interest, though the dollar amount of the limit need not be fine tuned." Nixon, 120 S.Ct. at 904. Rather than setting a specific dollar amount as the minimum constitutional threshold for individual contribution limits, the Supreme Court defined the relevant test as "whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render contributions pointless." Id. at 909.
In support of its holding, the Court reaffirmed the distinction between contributions and expenditures for purposes of evaluating the constitutionality of campaign finance legislation. Id. at 903-905. The Court accepted the state's espoused interests in defending the legislation (the prevention of corruption and the appearance of corruption) without the rigorous evidentiary showing required by the Eighth Circuit in Shrink II. Id. at 905-908. Instead, the Court relied in part upon the evidence presented in Buckley to demonstrate that the state's anti-corruption rationale was sufficiently supported to justify Missouri's contribution limitations on individuals. Id.
*916 Importantly, however, Nixon, does not address contribution limitations on political parties. The Court's reasoning, which reaffirms the legitimacy of the state's anti-corruption rationale, is less persuasive when applied to contributions by political parties. In contrast, several Justices directly addressed this issue in Colorado Republican Federal Campaign Committee v. Federal Election Com'n, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (plurality), and concluded that contribution limitations on political parties in federal elections violate the First Amendment. See id. at 626, 116 S.Ct. 2309.[3] Those opinions, of course, do not provide definitive legal support for plaintiffs' position because they are partial dissenting opinions only.[4] In addition, a majority of the Justices believed that the issue of political party contributions was not properly before the Court.
The Court also believes that plaintiffs' attack on Missouri's anti-evasion rationale may have merit because determined contributors can easily circumvent the individual limits, even with the political party contribution limitations in place.[5]
*917 The Court recognizes that the Nixon Court rejected Colorado Republican as inapposite on contribution limits because "the issue in question was limits on independent expenditures by political parties, which the principal opinion expressly distinguished from contribution limits." 120 S.Ct. at 907. However, the Court reads this statement as an attempt to distinguish generally between expenditures and contributions, not as an attempt to distinguish between contributions by political parties and individuals.[6]
Thus, the Court is left with uncertainty as to the proper legal standard that should apply in this case. However, plaintiffs have presented the Court with substantial authority that appears to support their position. Although in a different case the Court might require of the movant a stronger showing of the probability of success on the merits, in this case the Court finds that plaintiffs have met their burden of raising "questions so serious and difficult as to call for more deliberate investigation." Dataphase, 640 F.2d at 113. When considered in conjunction with the potential harms faced by plaintiffs if the injunction were vacated, the Court believes that the first factor of the Dataphase test weighs in favor of continuing the preliminary injunction.

B. Remaining Dataphase Factors

In its Order dated January 13, 1999, the Court found that the remaining Dataphase factors also weighed in favor of granting the preliminary injunction. See Lamb, 31 F.Supp.2d at 1164. In particular, the Court held:
Because enforcement of § 130.032.4's limits impairs plaintiffs' ability to promulgate and advance their political beliefs and ideas, plaintiffs face the threat of irreparable harm if an injunction is not granted. The Court also agrees with plaintiffs that the balance between that harm and the injury that granting the injunction may cause defendants and other interested parties tips decidedly towards plaintiffs. Lastly, the Court finds that as plaintiffs' motion appears to have a sound constitutional underpinning, issuing the injunction is in the public interest.
Id. Plaintiffs contend that the analysis of these remaining Dataphase factors has not changed since that time and still requires the issuance of the preliminary injunction.
In addition, plaintiffs contend that they will suffer the following irreparable harm if the preliminary injunction were vacated: 1) the Missouri Republican Party's candidate recruiting efforts will be hampered because it will be unable to contribute promised "seed money" to prospective candidates in excess of the statutory limits; 2) the Missouri Republican Party's ability to support its candidates through the use of in-kind contributions could be diminished; and 3) plaintiffs could face significant penalties for making and accepting contributions in excess of the statutory minimum.
For their part, defendants contend that they will suffer irreparable harm if the preliminary injunction is not vacated. Defendants claim that, with the reinstatement of the individual contribution limits through Nixon, "the state and the public now face a risk that the Court found not to be present when it issued the preliminary injunction in this case, namely that individuals will try to evade the limits by funneling money to candidates through party committees." (Defs.' Reply at 12). Defendants also maintain that the compelling public interest in preventing corruption, the appearance of corruption and the evasion of individual limits through the use of contribution limits outweighs any potential *918 harm to plaintiffs if the injunction were vacated.
Defendants also argue that plaintiffs' claims of irreparable harm are specious. Defendants contend that plaintiffs have failed to identify a specific candidate to whom they intend to make a contribution in excess of the statutory limits, and that plaintiffs' claim of stifling recruitment activities "has been invented for purposes of this case."[7] (Defs.' Reply at 13). Defendants also maintain that plaintiffs' concerns about in-kind contributions are a red herring because plaintiffs have not challenged the classification of in-kind contributions. As for plaintiffs' concerns about potential penalties for failure to comply with the statutory limits, defendants contend that "those matters are either water under the bridge or potential harms that can be adequately addressed in consideration on the merits." (Defs.' Reply at 15).
The Court believes that the balance of harms tips decidedly in favor of plaintiffs. The Court still believes that plaintiffs face irreparable harm if their ability to promulgate and advance their political ideas, especially by supporting candidates with "seed money," is hampered or potentially extinguished before this case is decided on the merits. Missouri is now in the early stages of an election year. Filing began on February 29, 2000. John Hancock, executive director of the Missouri Republican Party, avers that plaintiffs "are now in one of the busiest times in the election cycle because we are in the midst of party building and candidate recruitment and commitment." (Hancock Aff. at ¶ 2).
During election years, the Missouri Republican Party directs its recruitment efforts toward candidates running for introductory levels in state government. (Hancock Aff. at ¶ 3). For these candidates without the personal means to finance their campaigns, the Missouri Republican Party is their only source for "seed money." (Hancock Aff. at ¶ 4). The Missouri Republican Party has already promised to fund the start-up costs for several of these candidates, which could easily exceed the statutory limits. The potentially devastating impact upon plaintiffs' recruitment efforts if the preliminary injunction were vacated is summarized by Hancock as follows:
Stated plainly, the failure to adequately support potential candidates early equals failure to recruit. Failure to recruit equals failure to run candidates for some offices. Failure to present Republican candidates to the voters equals failure to do our job. Finally, failure to do our job equals diminished public choice in elections. Thus, [contribution] limits equal irreparable harm to the party and the public.
(Hancock Aff. at ¶ 8). The Court agrees.
Even more troublesome to the Court is the threat of irreparable harm to plaintiffs in the form of substantial penalties for failure to comply with the statute. In their motion to vacate, defendants contend that, with respect to contributions made before the Court enjoined enforcement of the law, they took no action to impose liability for the surcharge contemplated by § 130.032.7 other than to send the required notices for the return of non-allowable contributions. Defendants are noticeably silent, however, about the effect, if any, that vacating the preliminary injunction now will have on those contributions and the contributions made during the time period that the injunction was in effect. Although defendants argue that collection of surcharges is not imminent because the state would first have to file a collection action to collect the surcharges, they make no representations to the Court that the state will forego any collection or other actions pending resolution of this action. Instead, they simply assert that plaintiffs are not facing potential harm because they could seek a stay of any collection *919 action during the pendency of this case. The Court does not believe that this potential remedy diminishes the possibility that plaintiffs could be irreparably harmed if the preliminary injunction were vacated.
Defendants are correct that they are now facing a potential harm  evasion of the individual contribution limits  that was not present when the Court issued the injunction on January 13, 1999. The Court has doubts, however, about the immediacy and severity of this potential harm. Defendants have presented the Court with no evidence about the logistics of enforcing the individual limits after Nixon. The Court is unwilling to speculate as to the timing and implementation of the individual limits, and without this evidence the Court cannot conclude that any potential harm to defendants is sufficiently imminent so as to warrant vacating the preliminary injunction.
Moreover, as discussed above, even if the preliminary injunction were vacated, contributors could still evade the individual limits. Thus, the Court does not believe that any potential injury to defendants is so serious as to outweigh the potential harm to plaintiffs if the injunction were vacated.
In sum, the Court believes that the balance of harms in this case favors preservation of the status quo pending a ruling on the merits of this case. Given the importance of the issues presented, the Court believes that expedited treatment of this case is warranted. Accordingly, after reviewing the joint proposed scheduling plan filed by the parties on February 8, 2000,
IT IS HEREBY ORDERED that the following schedule shall apply in this case, and will be modified only upon a showing of exceptional circumstances:

I. SCHEDULING PLAN
1. Disclosure shall proceed in the following manner:
(a) The parties shall make all disclosures required by Rule 26(a)(1), Fed.R.Civ.P., no later than March 20, 2000.

(b) Plaintiff shall disclose all expert witnesses and shall provide the reports required by Rule 26(a)(2), Fed.R.Civ.P., no later than April 3, 2000, and shall make expert witnesses available for depositions, and have depositions completed, no later than May 29, 2000.

(c) Defendant shall disclose all expert witnesses and shall provide the reports required by Rule 26(a)(2), Fed.R.Civ.P., no later than May 1, 2000, and shall make expert witnesses available for depositions, and have depositions completed, no later than May 29, 2000.

(d) The presumptive limits of ten (10) depositions per side as set forth in Rule 30(a)(2)(A), Fed.R.Civ.P., and twenty-five (25) interrogatories per party as set forth in Rule 33(a), Fed.R.Civ.P., shall apply.
(e) The parties shall complete all discovery in this case no later than May 29, 2000.

(f) Motions to compel shall be pursued in a diligent and timely manner, but in no event filed more than eleven (11) days following the discovery deadline set out above.
2. The Court is not setting a dispositive motion deadline because plaintiffs believe summary judgment is inappropriate in this case, and defendants have already filed a notice of motion pursuant to E.D.Mo.L.R. 4.05 as to a motion for summary judgment, and the completed motion package on that motion is due no later than March 28, 2000. No other notice of motion shall be filed without leave of Court.

II. ORDER RELATING TO TRIAL
This action is set for a NON-JURY trial on July 5, 2000, at 9:00 a.m. This is a two week docket.
In this case, unless otherwise ordered by the Court, the attorneys shall, not *920 less than twenty (20) days prior to the date set for trial:
1. Stipulation: Meet and jointly prepare and file with the Clerk a JOINT Stipulation of all uncontested facts, which may be read into evidence subject to any objections of any party set forth in said stipulation.
2. Witnesses:

(a) Deliver to opposing counsel, and to the Clerk, a list of all proposed witnesses, identifying those witnesses who will be called to testify and those who may be called.
(b) Except for good cause shown, no party will be permitted to call any witnesses not listed in compliance with this Order.
3. Exhibits:

(a) Mark for identification all exhibits to be offered in evidence at the trial (Plaintiffs to use Arabic numerals and defendants to use letters, e.g., Pltf-1, Deft.-A, or Pltf Jones-1, Deft Smith-A, if there is more than one plaintiff or defendant), and deliver to opposing counsel and to the Clerk a list of such exhibits, identifying those that will be introduced into evidence and those that may be introduced.
(b) Submit said exhibits or true copies thereof to opposing counsel for examination. Prior to trial, the parties shall stipulate which exhibits may be introduced without objection or preliminary identification, and shall file written objections to all other exhibits.
(c) Except for good cause shown, no party will be permitted to offer any exhibits not identified or not submitted by said party for examination by opposing counsel in compliance with this Order. Any objections not made in writing at least ten (10) days prior to trial may be considered waived.
4. Depositions, Interrogatory Answers, and Request for Admissions:

(a) Deliver to opposing counsel and to the Clerk a list of all interrogatory answers or parts thereof and depositions or parts thereof (identified by page and line numbers), and answers to requests for admissions proposed to be offered in evidence. At least ten (10) days before trial, opposing counsel shall state in writing any objections to such testimony and shall identify any additional portions of such depositions not listed by the offering party which opposing counsel proposes to offer.
(b) Except for good cause shown, no party will be permitted to offer any interrogatory answer, or deposition or part thereof, or answer to a request for admissions not listed in compliance with this Order. Any objections not made as above required may be considered waived.
5. Findings of Fact, Conclusions of Law and Trial Brief: Submit to the Court and to opposing counsel full, complete, and specific findings of fact and conclusions of law, together with a trial brief, citing authorities, in support of said party's legal theories and discussing any anticipated substantive or procedural problems.
6. Motions in Limine: File all motions in limine to exclude evidence, and submit a courtesy copy directly to the Court's chambers, at least ten (10) days before trial.
Failure to comply with any part of this scheduling order may result in the imposition of sanctions.
IT IS FURTHER ORDERED that defendants' motion to vacate the preliminary *921 injunction dated January 19, 1999 [# 37] is denied.
NOTES
[1] Of course, any findings of fact and conclusions of law forming part of the Court's decision are subject to the "general rule" that "`the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'" Henderson v. Bodine Aluminum, Inc., 70 F.3d 958, 962 (8th Cir.1995) (quoting University of Texas v. Camenisch, 451 U.S. 390, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981)).
[2] After remand from the Supreme Court in Nixon, the Eighth Circuit concluded that "the State has adequately justified the contribution limits in their entirety" and therefore vacated its prior order enjoining enforcement of § 130.032.1 in all respects. Shrink Missouri Government PAC v. Adams, 2000 WL 228251 (8th Cir. Feb.29, 2000).
[3] In Colorado Republican, the Supreme Court held that limits on independent expenditures by political parties in federal elections violate the First Amendment. 518 U.S. at 604, 116 S.Ct. 2309. Seven members of the Court supported the Court's judgment that limits on a political party's independent expenditures (i.e., expenditures made by a political party that are not coordinated with a candidate) violate the First Amendment. Justice Breyer announced the judgment of the Court and delivered an opinion, joined by Justices O'Connor and Souter, finding that limits on independent expenditures violate the First Amendment. However, four other members of the Court  Chief Justice Rehnquist and Justices Kennedy, Scalia and Thomas  would have also held that limits on both independent and coordinated expenditures (which are considered contributions pursuant to § 441a(a)(7)(B)(I) of the Federal Election Campaign Act) violate the First Amendment. Id. at 626, 116 S.Ct. 2309.
[4] Justices Kennedy and Thomas authored opinions concurring in the judgment and dissenting in part. Justice Kennedy argued that the "central holding" of Buckley is "that spending money on one's own speech must be permitted ... and this is what political parties do" when they make expenditures on behalf of their candidates. Colorado Republican, 518 U.S. at 627, 116 S.Ct. 2309. For this reason, Justice Kennedy would have held that "[p]arty spending `in cooperation, consultation, or concert with' a candidate ... is indistinguishable in substance from expenditures by the candidate or his campaign committee," and both are protected by the First Amendment. Id. at 630, 116 S.Ct. 2309. However, Justice Kennedy also recognized that "Congress may have authority, consistent with the First Amendment, to restrict undifferentiated political party contributions which satisfy the constitutional criteria we discussed in Buckley, but that type of regulation is not at issue here." Id.

Justice Thomas found that the "anti-corruption rationale" for contribution limits "loses its force" when "applied in the specific context of campaign funding by political parties" as follows:
What could it mean for a party to "corrupt" its candidate or to exercise "coercive" influence over him? The very aim of a political party is to influence its candidate's stance on issues and, if the candidate takes office or is reelected, his votes.... For instance, if the Democratic Party spends large sums of money in support of a candidate who wins, takes office, and then implements the Party's platform, that is not corruption; that is successful advocacy of ideas in the political marketplace and representative government in a party system.
Id. at 645, 116 S.Ct. 2309.
[5] Plaintiffs provide the following example in their brief opposing the motion to vacate:

[A]n individual, for example, who wanted to contribute $54,825 to a statewide candidate of a political party could make a direct contribution of $1075 to the candidate and write five checks in the amount of $10,750 payable to five different "political party committees"  the party's state committee, one of its congressional district committees, one of its state senatorial district committees, one of its state representative district committees, and one of its county committees. Although the contributor could not require any one of these five committees to make a contribution to a particular candidate, each committee could contribute up to $10,750 to the candidate who inspired the contribution. At bottom, given a multitude of political party committees, limits on contributions made by a political party committee to its candidate do not prevent evasion of limits on individual contributions to candidates; only limits on contributions to a political party committee could, if constitutionally valid, work to achieve this end. (Pls.' Mem.Opp. at p. 8-9, n. 3) (internal emphasis omitted).
[6] Moreover, the district court upon remand in Colorado Republican found that limitations on coordinated expenditures by political parties (which are treated as contributions under the Federal Election Campaign Act) also violate the First Amendment. See Federal Election Com'n v. Colorado Republican Federal Campaign Committee, 41 F.Supp.2d 1197, 1213 (D.Col. 1999).
[7] The amended version of Exhibit B to defendants' reply in support of vacating the preliminary injunction demonstrates that defendants have grossly overstated their argument on this point.